number 13-3684, Ms. Freeman, and Mr. Dolginus. Take your time setting up. Just to let counsel know, we'll probably take a break after this oral argument for about a minute. Whenever you're ready, ma'am. Thank you. Good morning, Your Honors. May it please the Court, my name is Ariana Freeman of the Federal Community Defender Office for Appellant Simone Perella. I would like to reserve three minutes for rebuttal. You sure can. Thank you. There is no question that Simone Perella and his cohorts killed Jorge Figueroa. We know that to be true. But we also know four other pieces of information that are essential to the claim before this Court. Number one, we know because the state court found that Mr. Perella is intellectually disabled. He has IQ scores in the 50s. Number two, we that a doctor of nuclear medicine observed that every region of the thinking part of his brain is abnormal. And the part that processes information is, quote, egregiously abnormal. Number three, we know that Mr. Perella was a severe abuser of multiple drugs and that he was using drugs at the time of the offense in this case. And number four, we know that a jury in the penalty phase retrial for this very case heard all the facts of this homicide and Mr. Perella's other homicides and still found that at the time of this homicide, Mr. Perella was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. That's the E3 mitigator in the Pennsylvania death penalty statute. And the Pennsylvania Supreme Court has stated that with regard to involuntary intoxication, the E3 mitigator and diminished capacity are functional equivalents. And that is the subject of the very belated Rule 28J letter that I filed last night. I apologize for the submission of that. If you could, why don't you address the procedural default issue at the outset? Absolutely. In other words, did the district court error in concluding that Perella's claim was procedurally defaulted? It did, Your Honor. The claim was, I don't think there is at this point any debate about whether the claim was fairly presented to the lower PCRA court. And we've addressed that at length in our brief. I also think that we addressed in the reply brief that the claim was fairly presented to the Pennsylvania Supreme Court as well. There are two claims in the Pennsylvania Supreme Court brief that are, that pertain to mental health evidence. There is a penalty phase mitigation claim and the guilt phase diminished capacity claim. You know, one problem I was thinking about is the way that this claim, the diminished capacity claim, was presented to the courts, to the Pennsylvania Supreme Court and to the court, the Post-Conviction Hearing Act Court. There seemed to be phrases that were embedded in different sections of a brief. I mean, it's the sort of thing that if you think it's important enough, you want to apprise the reviewing court that this is my claim, it would be a point that you make in your brief. It would be highlighted. You might devote an entire section to it, but you have to sort of like go through the weeds to see if you can find it. So in that circumstance, how do you, how can we say that it fairly apprised the reviewing courts in Pennsylvania? Well, Your Honor, claim three of that brief to the Pennsylvania Supreme Court was ineffective assistance at guilt and penalty phases. And within that claim, the only ineffective assistance at guilt phase that's discussed is failure to present evidence supporting diminished capacity or other mental health defenses that could reduce the degree of murder from first degree to third degree. So to the extent that it's in, it's in the heading, it's in each subheading that trial counsel is ineffective at the guilt phase of trial and that there are numerous references to diminished capacity and to the evidenceary proffer about the various mental impairments that Mr. Perrella has, we do believe that it was fairly presented to the court. The court didn't rule on the request? The court did not rule on it. No, it did not. But this would not be the first time that the Pennsylvania Supreme Court has failed to rule on claims that this court has ruled were fairly presented to it. You're about to address the timeliness of the claim? I'm sorry? Were you going to address the timeliness? The timeliness of the claim. Well, the timeliness of the claim, I'm not sure that at this level the Commonwealth has objected to the timeliness of this particular claim. They've acknowledged that this is, this petition was filed pre-edpa and was appropriately amended twice since. And so I believe that there's no debate at this point that this claim is properly in front of the habeas court. On diminished capacity, isn't it very clear from what the defendant did that he was the one in charge, he was the one ordering people to kill others, that when his brother refused to kill someone, he stepped in and did it himself? Is there evidence of these deliberate acts that he took consciously? And I find it very difficult to associate diminished capacity with what actually occurred. Well, you're correct that the Commonwealth's evidence at trial did indicate that Mr. Perrella had ordered the killing in this case. But what we need to consider and what the mental health experts would have presented at trial had they been consulted by trial counsel was Mr. Perrella's unique mental circumstances. Did anybody come to the conclusion that Mr. Perrella had diminished capacity? Yes, Your Honor, we do have... Judge Temin in the Ortiz matter, stuff was brought up, was it not? Judge Temin found certainly that Mr. Perrella is intellectually disabled and at the time it was... This was back in 04? Yes, yes, and using the term mental retardation at that point. But we do in our proffer to this court and we have experts who have opined that Mr. Perrella's ability to control his conduct is substantially impaired by his brain dysfunction and to use other language that is the equivalent of diminished capacity. Let me pick up on Judge Roth's point. If we were to agree with you that counsel was deficient for any number of reasons, you still have the prejudice problem. And so the question is would you have gotten a different result given that once you assert this defense, Mr. Perrella would have to concede that he killed. And the government would be able to prove just how he did it, not to mention three other homicides and how he did those in order to prove to the jury that he knew exactly what he wanted to do and he did it. So in the prejudice problem, don't you have a complete hill, steep hill to climb? We do, but I think that's why the January 2000 resentencing in this case is so important because the jury in January 2000 heard all of those facts and still found the E2 and the E3 mitigators, which are mental health mitigators that pertain to Mr. Perrella's state of mind and ability to really mental capacity to form specific intent. This is where the State Supreme Court remanded? That's correct, Your Honor. The penalty phase retrial. Why was there not a remand with regard to the conviction phase? The remand was based on a closing argument by the prosecutor in the penalty phase of trial that the Pennsylvania Supreme Court found to be improper. So because it was the penalty phase closing only, they remanded only for that portion of the trial. So what in the end do you want? Do you want an evidentiary hearing? What do you want from us? Obviously it's based on the effective assistance of counsel, but what relief are you looking for? What we ask from you is a remand to the district court. We believe that the district court never engaged with the facts of this claim using the correct standard of review, and to the extent that there is any question and any debate about the truthfulness of the facts that we've proffered, we would ask for the district court to resolve that. Is there anything to dispel the idea that this might have been a trial strategy on the part of counsel? There is, in fact. We know that trial counsel didn't meet with Mr. Parla until just a few days before. By trial strategy, I mean consciously not pursuing a diminished capacity. Absolutely. That's because then the government would be able to bring in a lot of prejudicial information. Absolutely. We know that it was not his trial strategy because he didn't do any investigation into the facts, so he wouldn't know whether there was a viable diminished capacity defense or not. He didn't speak to Mr. Parla or any of his family members. He didn't consult with a single mental health expert, and so he couldn't have made a choice not to present this when he didn't know whether the defense existed. And we have made arguments that that was deficient performance in failing to properly investigate this. And without that investigation, he could not have made a strategy call not to present this. All right. Why don't we hear from Mr. Dulgeness, and then we'll get you back on rebuttal then. Thank you. Good morning, Your Honors. Tom Dulgeness for the Commonwealth Appellees. Let me first just very briefly on the default issue. I should say that under the habeas statute, if the underlying claim is facially meritless, the court can deny relief without reaching the default issue, and I think this might be, frankly, an appropriate case because the claim of ineffectiveness for failing to pursue a diminished capacity defense under these facts and under the law is facially meritless. How is it facially meritless? I mean, you've got, when you look, was the evidence that was submitted in connection with Mr. Parla's Atkins hearing in the Ortiz case, was that submitted here? You mean to the judge here? To the judge here, no. Well, to the district court, yes, but not to the state court judges or fact finders. Because, I mean, you've got just a host of information that he's, you know, as Judge Simmons said back in 2004, that his IQ scores are in the retarded range. He has the level of a seven- to nine-year-old within the Peabody picture of vocabulary test. He's approximately a kindergarten to first grade level under the Woodcock Munoz test. You could go on and on. Even a Commonwealth expert agreed, quote, that Parla had significant deficits in his cognitive functioning and provided no test. Well, if that's the case, it seems like the attorney should have, this was the thing to pursue. Well, Your Honor, a finding that someone is an Atkins excludable, that is mentally disabled, is not the equivalent of a finding that that person is incapable of forming the specific intent to kill. And you may be right. I mean, there's no doubt about that. And there is, in this case, so much evidence, the planning, the motive, his phrases. During the attack, he says to his brother, Densey, Parla says to his brother, Densey, kill Georgie. Densey refuses. He slaps Densey a few times and then commences to stab me himself. I don't even know what the argument is that there's no specific intent to kill. What is exactly, what as a defense lawyer do you say when you're up in front of a jury and you're making an argument that my client shouldn't be convicted because he didn't intend to kill anybody? It's one thing to be, as I say, an Atkins excludable. It's another thing to argue in front of the jury that he's not guilty of first-degree murder. But isn't the problem that the defendant didn't have an opportunity to even present that defense to a jury? Well, at some point. Because counsel was deficient, didn't investigate, didn't get all the necessary information to present to the jury. The lack of investigation claim can be tricky, but at some point we have to have evidence that the defendant did not have a specific intent to kill. And I know the question came up when Ms. Freeman was arguing about whether any expert has, in fact, concluded that Mr. Perella did not have a specific intent to kill. It's our position that no expert actually has concluded that. The experts who were looking at Mr. Perella looked at him, examined him in the context of the penalty phase, in which they were looking for mitigation. And they said mitigation, we believe there was mitigation available or available. But the issue was brought up before the Pennsylvania Supreme Court with respect to the guilt phase. According to Ms. Freeman, she just mentioned that point three in the brief to the Pennsylvania Supreme Court? That gets me back to the default point, which is that, I mean, if you look at the brief, there's no definition of diminished capacity. This is the brief in front of the Pennsylvania Supreme Court. There's no definition of diminished capacity. There's no citation to cases as to what diminished capacity means. There's no argument setting out where in the various defense expert opinions one can find support for the proposition that he didn't have the specific intent to kill. There's no discussion of how such a defense could fit here, given these facts. The statement of issues involved doesn't say anything about diminished capacity. And I would say that. It wasn't artfully presented, but is all that necessary in order to preserve the claim? Yes. I think that in order to fairly present a claim to a court just as this court, I think you have to frame the claim in a way that's clear and not require the court to do all the work itself. I should say that when we responded to that brief back in 1997, we didn't respond to a diminished capacity claim. Perhaps that was a failing. But in their reply brief, they didn't say you missed a diminished capacity claim. The reply brief simply addressed the ineffectiveness of sentencing. And I should also point out, and I go into this in that brief, is that the PCRA court, the lower court, rejected a materially identical argument as being insufficiently specific and asked for a more specific statement of the psychological claims. So what Mr. Perella's lawyers did in front of the Pennsylvania Supreme Court was revert to the version of the claim that the court had already found, that the PCRA court had found to be insufficiently specific. If I could address the question of the 2,000 sentencing jury. What the 2,000 sentencing jury was asked to find, this is the jury that on remand actually decided against the death penalty in this case. They were asked to find whether Perella was under the influence of extreme mental or emotional disturbance. That's one mitigating factor. And the other one was the capacity of Perella to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Those mitigators were not defined by the court. Both mitigators are, in fact, consistent with having the specific intent to kill. Specifically, if the jury believed that Perella acted out of a poor impulse control, that would fit those mitigators, and it does not fit diminished capacity. Pennsylvania law is very clear on the point that poor impulse control is not diminished capacity friendly. In any event, what the jury heard in 2,000 was very different from the facts of the crime. But there were significant mitigating factors that counseled against making the death penalty as opposed to life. And then the question really becomes why in the world did his counsel at the guilt phase not bring these issues which were just sort of staring you in the face, not even consulting with any significance with an expert who was prepared to testify? Well, I think that's hindsight speaking. Excuse me, I had a cold and this morning I'm having trouble making words out. It's hindsight speaking because if you read the transcript of the trial, there doesn't seem to be any indication of any mental illness on the part of the defendant. Well, that's part of the problem. Well, but what we have here are allegations that defense counsel didn't know certain things, didn't take certain actions. Defense counsel died in 1986. He was never asked about any of this stuff. I think it's pretty clear he didn't consult with a psychiatrist, but we don't know what he thought. We don't know what he saw. But he was aware of the mental deficiencies of his client at that time. Was he aware of the mental deficiencies? I mean, he was told by Perella's own brother. He knew he had actually apparently contacted Dr. Grosso, but didn't follow up. He contacted Dr. Grosso, if you look at the transcript, for purposes of making a sentencing presentation. Is this simply also that the problem is he didn't even bother to investigate as required by the Supreme Court, investigate the background, the information, mental status of his own client? But all of that information, all of those are allegations. Those are allegations from Perella and his family. We don't have any corroborating information in the record other than the fact that he didn't call Dr. Grosso until right before or within a few days before the trial. And it's certainly the fact that he thought it was a good idea to talk to Dr. Grosso is a function of this being a death penalty case as opposed to evidence that he thought that there was something wrong with his client. Doesn't the fact that he spoke to his client just a couple of days before trial then credence to the assertions that he didn't bother doing any investigation? Again, that's an allegation. It's an allegation, but the government hasn't really presented anything to counter the allegation. Should we dismiss it simply because it's the petitioner making it? I think that's a rather extreme position. No, but I think absolutely you can take into account the position of the person making the allegation and the interest in the allegation that they're making. I mean, the Supreme Court has made it clear that when you're talking about ineffectiveness of counsel raised on collateral review that the burden lies with the petitioner. And if there was an absence of evidence in the record, then there's a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Even if he didn't talk to counsel, once again, you have to put yourself in this counsel's position. First of all, we don't know. There's no indication. We don't know whether Mr. Perella was willing to admit his role in the crime. After he was convicted, he was willing to admit his role in the crime. Before he was convicted, it's a different matter. We have no information about that. To argue to the jury, this man did in fact commit these crimes. This is the prosecution's evidence. They're telling the truth about what he did. And yet he didn't have a specific intent to kill. That would be the argument, the presentation that the defense counsel would have to make. And then the defense counsel would have to take the chance that the prosecution would be introducing evidence of his three other murders and one other assault that wasn't a murder because the jury victim didn't die. You're addressing the prejudice problem, I think, of the Strickland standard rather than whether counsel was deficient. No. I think that information is germane to both prongs. In other words, if I'm defense counsel and I'm strategizing about what I should or should not do, I have to take into account the strength of the presentation I'd be making, the strength of the prosecution's rebuttal, what I could say could pass the laugh test. That's part of being a counsel. But as your Honor says, it's also very relevant to the prejudice problem. You say you put yourself in counsel's position. In this case, putting yourself in counsel's position, the thing that would just jump out at you is this is a tough case unless you can show some type of diminished capacity, something that may, in the jury's mind, affect intent. And it appears not only was that not done, it really wasn't even explored. You had an opening statement that was egregiously short. It looked like counsel here just gave up the ghost and didn't even try. Well, I think it's not fair to him to say he didn't even try. Your Honor is pointing to something that's concerning, that we require and expect certain things be done by defense counsel and certain preparations be made. The Supreme Court has recognized that sometimes with a bad case, the best you can do, is to try to expose defects in the prosecution's case by cross-examination. In fact, it would seem that this is the only conceivable avenue of defense, especially in light of this person's prior record and the way that the murder was carried out here. But we're not talking, Your Honor, about brain damage generally. We're coming out of the fog of the death penalty and into the bright light of the elements of the crime. There has to be evidence that he did not intend to kill Georgie Figueroa. And that is a showing that is impossible on this evidence. How do you say, again, kill Georgie? How does that even start? Understood. And that sounds like an argument that would be presented at a hearing, and counsel can present the other side of it and let the court sort it out as to whether on the guilt phase here, this person, the counsel, was acted ineffectively and whether it prejudiced the defendant here. One last point, if I may. At the 2000 resentencing hearing, something Judge Lazarus found is very relevant here. And as I understand the presentation of the other side, the key fact here is not simply the brain damage, the alleged brain damage, but the brain damage as it interacted with voluntary intoxication. There is no evidence, there was no evidence at trial that he was intoxicated or high. The only evidence here is from him, again, after he was convicted. And Judge Lazarus at the 2000 resentencing hearing refused to instruct the jury on voluntary intoxication as evidence supporting a mitigator because she found that there was no evidence of voluntary intoxication in this case. Again, the problem that I'm having is that even at the Adkins hearing in the Ortiz case, the Commonwealth's own experts said that there were significant deficits in cognitive functioning. I mean, that just, you know, that tells you what appears to be general agreement. And the question then becomes, was it so significant that it could obviate the intent? And I don't know the answer. It's not simply the depth, though, Your Honor, of the cognitive inabilities. It's the nature of them. It's one thing that he has to say that he has a developmental disability with respect to learning, which is ultimately what Adkins is about, and that's what those experts were talking about. It's quite another thing entirely to say that he did not have the ability to form the specific intent to kill when he told somebody to kill him, and when he didn't do it, he finished the job himself. That's an entirely different question. And if counsel isn't effective for avoiding that, it's hard for me to imagine a strategy that we could. But if you had that before a jury, and then if you had, for example, Dr. Rodriguez saying that the drug abuse exacerbated the brain dysfunction, and then you add on to that the testimony of Dr. Mosley, I mean, you could have a pretty darn interesting case. I don't see – I mean, I guess you and I are just disagreeing here. I don't understand even if those doctors had, in fact, examined Mr. Parrella, which they hadn't done, and they haven't actually concluded that he did not act with a specific intent to kill. I still have difficulty going to the jury and telling them that in this case, when he actually threatened to kill over a period of days and did kill because his victim was a snitch and his victim owed him money and he said, I'm going to kill you, I have trouble seeing how that, under any theory, is something that you would actually risk the jury hearing about his four other murders in order to take that risk. You may be right, but it seems as if that needs to get sorted out with regard to the prejudice, which is in effect what I – and I guess Judge Fuentes earlier thought you were talking about. With regard to the prejudice prong as to the claim of ineffective assistance of counsel. I mean, that's the issue, and you've got the arguments, but what this counsel did here was about as bad as I've seen in a long time. Well, sometimes you have a bad case, Your Honor. Thank you. Ms. Freeman. I'd just like to address a few of the points my opponent, Mr. Georgianus, made. First is he said that he's not sure what kill Georgie could mean if it wasn't a specific – if it wasn't showing specific intent to kill. He presented a lot of things that say that, look, this person you have to – cognitive disability doesn't necessarily preclude the intent to kill, and there's a lot of evidence that shows the intent to kill. And your argument to that would be? My argument is that we do have expert opinions, including from Dr. Rodriguez, that say that Mr. Perrella's organic brain dysfunction impaired his capacity for rational and premeditated thinking and that his periods of substance abuse exacerbated that impairment. And with regard to whether that would be a – so we have to think about Mr. Perrella and his brain. We have to think about Mr. Perrella and his intoxication as it plays into his really minimally functioning brain. And that is the question when you're looking for specific intent to kill. It's with respect to this individual, his brain, and his intoxication. My opponent also mentioned the decision, whether there could have been a reasonable decision not to present this claim. Or this defense at trial. And really, as your Honor, Judge Ambrose mentioned, there was no alternative that was chosen. A reasonable decision is a judge in light of all of the circumstances. And it's a choice among options. There was no choice here. He just didn't do anything. And with regard to corroboration of that fact, we do have on the record trial counsel answering the trial judge as to whether his client was on drugs with, I don't know. He didn't know in the midst of trial whether his client used drugs. So he certainly couldn't have presented or chosen not to present a voluntary intoxication defense because he didn't know if one was available. And finally, Your Honors, with regard to the allegations and the proper that Mr. Perrella has made in support of the availability of a diminished capacity defense at trial, to the extent that any of those facts are contested, the appropriate resolution would be to remand for a hearing per Townsend and Jefferson. Thank you very much. Thank you, both counsel. We'll take the matter under advisement and have a ten-minute recess.